**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

        Plaintiff

        v.

GOOGLE INC.

    and

ITA SOFTWARE, INC.

        Defendants.

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry

in this civil antitrust proceeding.

## I. NATURE AND PURPOSE OF THIS PROCEEDING

On July 1, 2010, Google Inc. ("Google") entered into a merger agreement to acquire ITA

Software Inc. ("ITA") for $700 million.  ITA develops and licenses a software product called

"QPX."  QPX is used by many airlines, online travel agents and online travel search sites to

provide extremely complex and customized flight search functionality to consumers.  QPX has

unique capabilities and acts as a type of mini-search engine for travel sites.  When a customer

1

wants to know the availability and cost of flights from Boston to San Francisco, for example, QPX is the tool that provides the answer.

Google intends to offer an online travel search product that will compete with existing travel search sites that provide the ability to search for airfares across a range of airlines, many of whom use QPX; these websites are referred to as Online Travel Intermediaries ("OTIs").  In essence, Google is acquiring a critical input not previously owned by a company that is a horizontal competitor to users of ITA.  This transaction therefore posed a significant risk that Google could use the acquisition to foreclose rivals or unfairly raise their costs.  Accordingly, the United States brought this lawsuit against Google and ITA on April 8, 2011, seeking to enjoin the proposed transaction.  Following a thorough investigation, the United States believes that, unless enjoined, the likely effect of the transaction as proposed by the parties would be to lessen competition substantially for comparative flight search services in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  This loss of competition likely would result in reduced innovation and reduced consumer choice in the comparative flight search market.

Simultaneous with the filing of the Complaint, the United States also filed a proposed Final Judgment designed to remedy the Section 7 violation.  The Final Judgment does not settle any claims which may arise under any other provisions of the laws, including Section 2 of the Sherman Act.

Under the proposed Final Judgment, which is explained more fully below, Defendants are subject to a variety of affirmative obligations, all of which are designed to ensure ongoing access to QPX for current ITA licensees and to enable new entrants or new licensees to obtain the QPX software on fair, reasonable, and non-discriminatory terms.  The licensing provisions require

Google to honor existing QPX licenses for OTIs, renew existing licenses under similar terms and conditions, and offer licenses to any OTIs not under contract on fair, reasonable, and non-discriminatory terms, judged in reference to similarly situated entities.  Google must continue with the development of ordinary course upgrades and enhancements to QPX, and must devote substantially as many resources to research and development for QPX as ITA did prior to the acquisition.  Google must license InstaSearch, an add-on to QPX which enables consumers to enter more flexible and creative queries in searching for flights.  Google must observe strict firewall commitments to ensure the confidentiality of licensee information.  In addition, Google must report certain complaints that it has directly or indirectly treated OTIs unfairly.  This obligation will enable OTIs who believe that Google has acted in an unfair manner with respect to flight search advertising[1] to make complaints and have written complaints brought directly to the attention of the Department of Justice.

 Google's affirmative obligations ensure that OTIs will have continued access to QPX after the merger, while preserving Google's ability to use QPX and ITA's engineering talent as a platform for developing new and innovative flight search services for consumers.  The proposed Final Judgment therefore strikes an appropriate balance between competing interests by preserving the potential significant efficiencies from the combination of Google's and ITA's complementary expertise while redressing the potential for anticompetitive foreclosure that could result from the acquisition.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA, unless the United States withdraws its consent.

---

[1] Google has the largest online search engine and generates revenue through the sale of online advertising.

Entry of the proposed Final Judgment would terminate this action, except that this Court would retain jurisdiction to construe, modify, and enforce the proposed Final Judgment and to punish violations thereof.

## II. DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A.      The Comparative Flight Search Industry

Over the past decade, consumer access to direct search and booking of air travel has been revolutionized.  The Internet has provided consumers with tools that enable them directly to search for customized itineraries.  Innovation in flight search tools has provided consumers with quick and convenient access to the most responsive and useful itineraries and prices.  Two different types of websites enable U.S. consumers to conduct Internet searches for domestic flight prices, schedules, and seat availability on multiple airlines simultaneously:  online travel agencies ("OTAs") and travel meta-search engines ("Metas").  In many respects, OTAs function like the online equivalent of brick and mortar travel agents, assisting users in identifying travel options and then in booking the consumer's choice.  Examples of OTAs are Expedia, Travelocity, and Priceline.  By contrast, the so-called Metas, such as Kayak, TripAdvisor, and Bing Travel, provide highly differentiated products with broad search capabilities – functioning almost like mini-search engines to enable consumers to search for flights.  The Metas, however, do not offer direct booking services (i.e., to purchase a ticket, consumers must click a link to an airline's website or to an OTA).  The largest Metas are all powered by QPX.  In addition to providing comparative flight search services, both Metas and OTAs often enable consumers to search for other travel products and services such as hotel rooms, rental cars, and vacation packages.  When described together, OTAs and Metas constitute OTIs.

To perform a flight search on any OTI, a consumer typically enters an origin and destination city and desired travel dates.  The OTI then provides a number of options on different airlines with varying routes and pricing.  Some travel sites – particularly the Metas powered by QPX, which has some unique capabilities and advantages – also offer more sophisticated and innovative flight search features, such as a fare predictor that allows consumers to identify the best time to buy a ticket for a particular trip, or an "anywhere" feature that allows them to explore different destinations by specifying a desired price range, activity, and/or temperature at the destination.

To provide flight search functionality, OTIs rely on pricing and shopping ("P&S") systems.  ITA's QPX is a sophisticated P&S system that is differentiated in several respects from its competitors.  P&S systems include not only the engine that performs the search, but also on-going access to seat and fare class availability data.  When a consumer on a OTI website submits a flight query (e.g., Boston to San Francisco, departing March 1, 2011, returning March 14, 2011), the website sends the query to the P&S system.  The P&S system accesses the fare, schedule, and seat availability information of multiple airlines, and uses a sophisticated algorithm to analyze the flight possibilities and convert the query into a list of available flight options.  It sends these options back to the OTI, which presents the available flight options to the consumer in a format that facilitates comparison (e.g., organized by price, departure or arrival time, or number and length of connections).  QPX is a highly accurate and well developed P&S system.

**B.**     **The Defendants and the Proposed Transaction**

Google's principal business is an online search engine.  Measured by the number of search queries or advertising revenue, Google is the largest search engine by far.  *See Author's Guild v. Google*, No. 05 Civ. 8136 (DC), 2011 WL 986049, at *12 (S.D.N.Y.  Mar. 22, 2011) (recognizing "Google's market power in the online search market").  In 2009, Google earned more than $23 billion in revenues in the United States. Google derives nearly all of its revenue from online search advertising, or the ads accompanying search engine results.

Google's only significant online search engine competitor is Bing, which has a much smaller share of both queries and advertising revenue.  In addition to providing general purpose search engines, Google and Bing also provide specialized search sites, known as "vertical" sites.  Bing, for example, offers a travel site that utilizes QPX to provide comparative flight search services.  In conjunction with its acquisition of QPX, Google has announced its intention to launch new travel search functionality on its websites.

ITA is the leading producer of P&S systems in the United States.  ITA's software is widely used by airlines and OTIs to search for, price, and display results for airline travel queries.

On July 1, 2010, Google and ITA entered into a merger agreement.  Unremedied, this transaction would provide Google with the incentive and ability to foreclose rivals (actually or effectively) from the comparative flight search market.  This could be accomplished by preventing licensees and potential licensees access to the leading comparative flight search product, QPX, or by hobbling them by failing to continue development at levels commensurate with the pre-merger environment.  This would diminish competition in this market and

effectively diminish consumer choice.  The transaction would substantially lessen competition in the comparative flight search market and is the subject of the Complaint and proposed Final Judgment filed by the United States in this matter.

**C.      Relevant Markets**

Antitrust law, including Section 7 of the Clayton Act, protects consumers from anticompetitive conduct, such as firms' acquisition of the ability to raise prices or reduce choice. Market definition assists antitrust analysis by focusing attention on those markets where competitive effects are likely to be felt.  Well-defined markets encompass the economic actors including both sellers and buyers whose conduct most strongly influences the nature and magnitude of competitive effects.  To ensure that antitrust analysis takes account of a broad enough set of products to evaluate whether a transaction is likely to lead to a substantial lessening of competition, defining relevant markets in merger cases frequently begins by identifying a collection of products or set of services over which a hypothetical monopolist profitably could impose a small but significant and non-transitory increase in price.

Here, the United States's investigation revealed that all OTIs rely on a P&S system, such as ITA's QPX, to drive the comparative airfare search offerings such websites offer their users. Should one company control all P&S systems, OTIs would have no alternative products to which they could turn to defeat a price increase.  As such, the market for P&S systems is a relevant product market.

The comparative flight search market is an additional relevant market implicated by this merger.  The market participants are OTIs that offer the ability for users to compare flights and prices across different airlines.  Comparative flight search is a relevant market because there are

7

no reasonable substitutes consumers could turn to if a company controlling all comparative flight search websites reduced the quality of its service.  Airline websites and reservation lines are not reasonable substitutes because they do not offer the comparative aspect of OTIs.  Brick and mortar travel agents are also not reasonable substitutes because travel agents do not provide the same sort of user control, instantaneous response, and flight search flexibility as OTIs.  Accordingly, comparative flight search services is a relevant product market.

Antitrust analysis must also consider the geographic dimensions of competition.  Here, the relevant markets exist within the United States and are not affected by competition outside the United States.  The competitive dynamics for both markets is distinctly different outside the United States.

**D.      Competitive Effects**

Since its introduction to the market in 2001, ITA has been the leader in P&S systems.  ITA has won nearly every competition for business in the United States in which the customer did not already have a P&S system in place.  ITA has also lost very few customers due to its ability to provide highly and uniquely customized P&S functionality.  ITA's customers include two of the five largest OTAs in the United States, and all five of the largest Metas.  ITA's P&S system, QPX, has an advantageous position against its competitors in terms of speed, configurability, and accuracy.  QPX consistently leads the industry in innovation.  In short, ITA has a leading position in P&S systems.  From a competition perspective, ITA's corporate independence from any particular OTI ensures that all of its customers receive the benefits of ITA's cutting edge innovation – i.e., there is currently no vertically integrated OTI owned by ITA that receives favorable treatment relative to ITA's other customers.

This will not be the case once Google purchases ITA.  Google intends to launch a new service after completing the transaction that will compete directly with other OTIs by providing flight search results.  Because so many OTIs rely on ITA as an input to their services, Google will have the ability and incentive to either shut off access to ITA to those competitors, or degrade the quality of QPX that is available to those competitors.  Such actions in the upstream pricing and shopping market would substantially reduce competition in the downstream comparative flight search market.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The proposed Final Judgment sets forth: (1) requirements regarding the parties' continued licensing and improvement of QPX; (2) requirements regarding the parties' licensing of InstaSearch, a new flight search technology under development by ITA; (3) procedures for resolving disputes between OTIs and the parties regarding licensing of QPX or InstaSearch; (4) requirements for the creation of a firewall at the parties' business regarding use of competitively sensitive information gained through provision of QPX or InstaSearch services; and (5) oversight procedures the United States may use to ensure compliance with the proposed Final Judgment. Section IX of the proposed Final Judgment states that these provisions will expire five years after entry of the proposed Final Judgment.

As discussed earlier, the United States' concerns regarding the proposed transaction revolve around Google's ability and incentive to weaken its competitors in the comparative flight search market by denying or degrading their access to QPX.  Denying or degrading rivals' access to QPX would potentially diminish competition in the comparative flight search market. Therefore, as discussed in more detail below, the key remedies embodied within the proposed

Final Judgment include guarantees that the key products on which OTIs rely will continue to be available in a robust fashion for at least five years after the entry of the Final Judgment.  Five years will provide those OTIs that do not wish to be dependent on Defendants' P&S system a sufficient period of time to switch to an alternative system.

## A.      Licensing and Improving of QPX

Section IV.A-G of the proposed Final Judgment preserves competition for OTIs by creating a legally enforceable commitment that Defendants will continue to license and improve QPX.  Sections IV.A-C require Defendants to honor the terms of all QPX agreements in effect as of the entry of the Final Judgment, negotiate extensions to existing QPX agreements with any OTI on the terms set forth in the OTI's existing contract for up to five years from the entry of the Final Judgment, and negotiate new QPX agreements with any OTI who is not party to an existing QPX agreement on terms that are fair, reasonable, and non-discriminatory.

Section IV.D prohibits Defendants from entering into any new QPX agreement that would prevent an OTI from using alternative products to QPX.  Defendants and an OTI, however, are free to enter into an exclusive QPX agreement if Defendants offer a non-exclusive agreement on fair, reasonable, and non-discriminatory terms.

Section IV.E requires Defendants to make available to OTIs ordinary course upgrades to QPX at the same price those upgrades are made available to other customers.  Section IV.F requires Defendants to devote substantially the same resources to the research and development and maintenance of QPX for the use of customers as ITA did in the average of the two years prior to the filing of the Complaint.  This requirement eases concerns that post-merger

Defendants will let the QPX product languish without committing resources to improve it over time.

Finally, Google intends to introduce a new travel search service that will include airfare pricing and shopping functionality. Section IV.G provides that Defendants are not required to offer OTIs any product, service or functionality that Google develops exclusively for its new travel search service.

**B.     Licensing of InstaSearch**

Prior to the proposed transaction, ITA was developing a product, called InstaSearch, for license to customers that promised to be the next generation in pricing and shopping services. InstaSearch was being developed to use a cache of results to provide instantaneous or near-instantaneous results to airfare search queries. One concern of the proposed transaction is that Google will prevent this innovative product from being made available to its OTI competitors. As such, the decree aims to ensure InstaSearch is available for license.

Sections IV.H-J of the proposed Final Judgment preserve competition for OTIs by requiring Defendants to negotiate InstaSearch agreements for terms up to five years from the entry of the Final Judgment. While ITA developed InstaSearch for future sale, it has not sold a commercial version of the product to any customers. ITA, however, has entered into a contract with one customer to deliver a "proof of concept" implementation of InstaSearch. The proposed Final Judgment requires Defendants to offer OTIs at least the same functionality as contained in the proof of concept attached to the proposed Final Judgment, and requires Defendants to make commercially reasonable efforts to ensure that the InstaSearch implementation conforms to the proposed technical specifications. Should Defendants provide an InstaSearch implementation to

any of their customers that is superior to the version envisioned by the proof of concept, the

proposed Final Judgment requires Defendants to make that improved product available to all

OTIs.  Finally, the proposed Final Judgment allows Defendants to charge fair, reasonable and

non-discriminatory fees for InstaSearch.

## C.    Arbitration Provisions

The proposed Final Judgment requires that the Defendants negotiate in good faith with

any OTI, but also sets forth certain procedures by which Defendants and OTIs can resolve

disputes over the fees charged for any type of service should Defendants and an OTI not reach

agreement over fees.  As described in Sections IV.K-M, Defendants shall submit to binding

arbitration over the disputed fees once certain conditions have been met.  The Defendants and the

OTI must, prior to submitting a matter to arbitration, designate a person at each company with

the authorization to resolve the dispute in a final and binding fashion, and those individuals must

meet in an attempt to resolve a dispute.  Additionally, prior to Defendants' being obligated to

enter into binding arbitration with an OTI, that OTI must certify to the United States that it

negotiated in good faith with Defendants, and further receive consent of the United States to

initiate arbitration.  Upon receiving consent of the United States to initiate arbitration, the OTI

may commence arbitration through the American Arbitration Association.  The parties may

agree to suspend the arbitration proceedings to attempt to resolve the dispute.

These procedures ensure that Defendants negotiate in good faith with all OTIs, and that if

an agreement cannot be reached between the OTI and Defendants on a price term, that a

resolution can be had quickly by an impartial third party using clear benchmarks from existing

contracts.  For non-price terms, the traditional decree enforcement provisions will provide the mechanism for resolving disputes.

**D.      Additional Provisions**

Section V of the proposed Final Judgment prohibits Google from taking certain actions that could undermine the purpose of the proposed Final Judgment.  Access to airline seat and booking class information is a critical input to a P&S system.  To ensure that Defendants do not restrict access to this crucial information, Section V.A prohibits Defendants from entering into agreements with an airline that restricts the airline's right to share seat and booking class information with Defendants' competitors, unless one or more airlines enter into exclusive agreements with a competitor.  Subject to certain limitations, Sections V.B-C require Google to make available to OTIs any seat and booking class information Defendants obtain for use in Google's new flight search service.  Finally, Section V.D prohibits Defendants from conditioning the provision of QPX or InstaSearch on whether or how much an OTI spends on other products or services sold by Google.

**E.      Firewall Requirements**

As alleged in the Complaint, Defendants could use information and data gained through contracts with OTIs to then compete with those OTIs.  Section VI of the proposed Final Judgment requires Defendants to establish a firewall at the company to prevent the misappropriation of competitively sensitive information and data.  That section requires that Defendants only use an OTI's confidential information for the provision of any product or

service to that specific OTI, for routine administrative or financial purposes, or for the continued

development and improvement of QPX or InstaSearch.  Google may use more limited query

information, which does not include data regarding how OTIs configure the QPX product, for the

improvement of Defendants' airfare pricing and shopping engines.  Section VI.A prohibits,

subject to a small list of exclusions, employees working on Google's travel search product from

accessing confidential OTI information.  Section VI.D requires Defendants to implement

procedures to prevent confidential information from being used or accessed by employees other

than those having a legitimate need for such information.  Finally, Section VI.E requires the

Defendants to submit its proposed procedures to the United States for its approval or rejection of

those procedures.

**F.      Compliance**

        To facilitate monitoring of Defendants' compliance with the proposed Final Judgment,

Section VII grants the United States access, upon reasonable notice, to Defendants' records and

documents relating to matters contained in the proposed Final Judgment.  Defendants must also

make their employees available for interviews or depositions about such matters.  Moreover,

upon request, Defendants must answer interrogatories and prepare written reports relating to

matters contained in the proposed Final Judgment.

        In addition, Sections IV.N-O requires Google to create a website where OTIs can access

a copy of the proposed Final Judgment and submit complaints that Google is violating the terms

of the proposed Final Judgment or is acting, directly or indirectly, in an unfair manner in

connection with flight search advertising in the United States.  Google must provide copies of

these complaints to the United States for a period of time from the earlier of five years from

entry of the proposed Final Judgment, or two years from the date Google launches its new travel

flight search service.

## IV. REMEDIES APPLICABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable

attorneys' fees.  Entry of the proposed Final Judgment will neither impair nor assist the bringing

of any private antitrust damage action.  Under the provisions of Section 5(a) of the Clayton Act,

15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent

private lawsuit that may be brought against Defendants.

## V. PROCEDURES APPLICABLE FOR APPROVAL OR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered by the Court after compliance with the provisions of the APPA, provided that the

United States has not withdrawn its consent.  The APPA conditions entry upon the Court's

determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least 60 days preceding the effective date of the

proposed Final Judgment within which any person may submit to the United States written

comments regarding the proposed Final Judgment.  Any person who wishes to comment should

do so within 60 days of the date of publication of this Competitive Impact Statement in the

Federal Register, or the last date of publication in a newspaper of the summary of this

Competitive Impact Statement, whichever is later.  All comments received during this period will be considered by the United States, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment.  The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> James J. Tierney
> Chief, Networks & Technology Enforcement Section
> Antitrust Division
> United States Department of Justice
> 450 Fifth Street, NW, Suite 7100
> Washington, DC 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, seeking preliminary and permanent injunctions against Defendants' transaction and proceeding to a full trial on the merits. The United States is satisfied, however, that the relief in the proposed Final Judgment will preserve competition in the comparative flight search market.  Thus, the proposed Final Judgment would protect competition as effectively as would any remedy available through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits.

## VII. STANDARD OF REVIEW UNDER THE APPA
## FOR PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the United States is entitled to "broad discretion to settle with the Defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act); *United States v. InBev N.V./S.A.*, 2009-2 Trade Cas. (CCH) ¶ 76,736, 2009 U.S. Dist. LEXIS 84787, No. 08-1965 (JR), at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a consent judgment is limited and only inquires "into whether the government's determination that the proposed

remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanism to enforce the final judgment are clear and manageable").[1]

Under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the United States's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public."  *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3.  Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.  The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is '*within the reaches of the public interest.*'  More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the

---

[1] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not

government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

In addition, "a proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also InBev*, 2009 U.S. Dist. LEXIS 84787, at *20

---

hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'").

("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged."). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d. at 1459-60.  Courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power*." SBC Commc'ns*, 489 F. Supp. 2d at 15.

        In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."  15 U.S.C. § 16(e)(2).  This language effectuates what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained:  "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 *Cong. Rec.* 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the Court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings."  *SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that the United States considered in formulating the proposed Final Judgment.

Dated: April 8, 2011

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA

Aaron D. Hoag
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., 7th Floor
Washington, D.C. 20530
Tel: (202) 307-6153
Fax: (202) 616-8544
Email: aaron.hoag@usdoj.gov

---

comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

## CERTIFICATE OF SERVICE

I, Aaron D. Hoag, hereby certify that on April 8, 2011, I caused a copy of the

Competitive Impact Statement to be served on defendants Google Inc. and ITA Software, Inc. by

mailing the document via email to the duly authorized legal representatives of the defendants, as

follows:

For Google:

John D. Harkrider
Axinn, Veltrop & Harkrider LLP
114 West 47th Street
New York, NY 10036
Email: jdh@avhlaw.com

For ITA:

Michele Sasse Harrington
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Email: michele.harrington@hoganlovells.com

FOR PLAINTIFF
UNITED STATES OF AMERICA

Aaron D. Hoag
Attorney
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., 7th Floor
Washington, D.C. 20530
Tel: (202) 307-6153
Fax: (202) 616-8544
Email: aaron.hoag@usdoj.gov